# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DEBORAH WHEELINGS, Administratrix** | : | **CIVIL ACTION** |
| **of the Estate of Lewis James Seals** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SEATRADE GRONINGEN, BV,** | : | |
| **SHIPPING COMPANY LOMBOK** | : | |
| **STRAIT, BV, and M/V LOMBOK STRAIT,** | : | |
| **her engines, tackle, equipment, furnishings,** | : | |
| **etc., in rem** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COMERCIALIZADORA ANFO, S.A.,** | : | |
| **also known as ANFO** | : | **NO.  06-1585** |

**NORMA L. SHAPIRO, S.J.**                                          **MAY 31, 2007**

## MEMORANDUM AND ORDER

This action arises from the death of a longshoreman, Lewis James Seals ("Seals"),

when he was crushed by a container on the vessel M/V Lombok Strait.  Plaintiff, Deborah

Wheelings ("Wheelings"), Administratrix of the Estate of Lewis James Seals, alleges breach of

turnover duty and breach of duty to intervene under the Longshore and Harbor Workers'

Compensation Act ("LHWCA"), 33 U.S.C. § 905(b),[1] and negligence under general maritime

---

[1]  33 U.S.C. § 905(b) provides:

"In the event of injury to a person covered under this chapter caused by the
negligence of a vessel, then such person, or anyone otherwise entitled to recover
damages by reason thereof, may bring an action against such vessel as a third
party in accordance with the provisions of section 933 of this title, and the
employer shall not be liable to the vessel for such damages directly or indirectly
and any agreements or warranties to the contrary shall be void. If such person was
employed by the vessel to provide stevedoring services, no such action shall be
permitted if the injury was caused by the negligence of persons engaged in
providing stevedoring services to the vessel . . . The liability of the vessel under
this subsection shall not be based upon the warranty of seaworthiness or a breach

law, with pendent state claims of negligence, wrongful death, and survival, against the vessel M/V Lombok Strait, its owner, Seatrade Groningen, BV ("Seatrade"), and Seatrade's agent, Shipping Company Lombok Strait, BV ("Shipping Company").  This court has federal question jurisdiction under 28 U.S.C. § 1331 and admiralty jurisdiction under 28 U.S.C. § 1333.

## I.    FACTS AND PROCEDURAL HISTORY

Defendant Shipping Company owns the vessel M/V Lombok Strait.  Shipping Company entered a Seatrade Reefer Pool Agreement with Seatrade Group, N.V. on November 29, 2002.[2]  The parties dispute the extent to which Shipping Company retained control over the M/V Lombok Strait under the Seatrade Reefer Pool Agreement.  The parties agree that Seatrade Group, N.V., time chartered the M/V Lombok Strait to Network Shipping (also known as "Del Monte") on behalf of Shipping Company.  The M/V Lombok Strait transported cargo loaded in Turbo, Colombia, and Moin, Costa Rica, to Camden, New Jersey, where the cargo was discharged.  Del Monte hired longshoremen to load cargo onto the M/V Lombok Strait at Turbo, Colombia, and Moin, Costa Rica, and hired the Delaware River Stevedores ("DRS") to discharge cargo from the vessel in New Jersey.  Defendant Seatrade was not party to this chain of charter contracts.

On September 30, 2002, Seatrade entered a contract with Shipping Company to perform management duties aboard the M/V Lombok Strait.  The contract states in relevant part:

thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter."

[2]  Seatrade Group, N.V., is a separate entity from defendant Seatrade, and is not party to this lawsuit.

"3.1 Crew Management . . .
The Managers[3] shall provide suitably qualified Crew for the Vessel as required by
the Owners in accordance with the STCW 95 requirements, provision of which
includes but is not limited to the following functions: . . . (vi) training of the Crew
and supervising their efficiency.

4.1 The Managers undertake to use their best endeavours to provide the agreed
Management Services as agents for and on behalf of the Owners in accordance
with sound ship management practice and to protect and promote the interests of
the Owners in all matters relating to the provision of services hereunder . . .

11.  Responsibilities . . .
(ii) Notwithstanding anything that may appear to the contrary in this Agreement,
the Managers shall not be liable for any of the actions of the Crew, even if such
actions are negligent, grossly negligent or wilful, except only to the extent that
they are shown to have resulted from a failure by the Managers to discharge their
obligations under sub-clause 3.1, in which case their liability shall be limited in
accordance with the terms of Clause 11."

(Defs.' Mem. in Opp. to Pl.'s Mot. for Partial Summ. J., Ex. A, App. 5.)

Defendants concede Seatrade was listed as the operator of the M/V Lombok Strait

on the United States Coast Guard's Vessel Response Plan form.  (Def.'s Answer to Pl.'s Mot. for

Partial Summ. J. on Agency ¶ 2.)

Shipping Company entered a third contract with Cobalt Shipping Limited

("Cobalt").  The contract provided Shipping Company would hire crew members through Cobalt,

and Cobalt would be free from liability except where Cobalt was negligent.  (Defs.' Mem. in

Opp. to Pl.'s Mot. for Partial Summ. J., Ex. A, App. 6.)  Shipping Company's contract with

Cobalt was not an exclusive manning agreement; Shipping Company avers it contracted with

various manning agencies to supply crew members for the M/V Lombok Strait.

---

[3]  Defendants' Dutch expert stated in an affidavit that Seatrade is the "Manager" of the
vessel M/V Lombok Strait under the contract.  (Defs.' Mem. in Opp. to Pl.'s Mot. for Partial
Summ. J., Ex. A at 2.)

On October 6, 2005, longshoremen in the Port of Turbo, Colombia, loaded reefer containers onto the M/V Lombok Strait.  The reefer containers were approximately forty feet long, eight feet wide, and nine and a half feet high, with gross weight capacities of approximately 74,960 pounds.  Semiautomatic "twist locks" vertically linked each corner of the containers.  The stevedores at Turbo, Colombia, and Moin, Costa Rica, supervised the loading of the cargo.  Each day of the ten day voyage to Camden, New Jersey, crew members of the M/V Lombok Strait recorded the temperature of container number FDPU200955-9 and the container below it, and inspected the lashing of the containers to maintain seaworthiness of the vessel.  Wheelings alleges a crew member of the M/V Lombok Strait, Norberto Villaber ("Villaber"), inspected the containers.

On October 16, 2005, DRS began discharge of the reefer containers from the M/V Lombok Strait in Camden, New Jersey.  Seals, a member of the International Longshoremen's Association, Local 1291, in Philadelphia, was hired to assist with the discharge.  Seals and at least two other DRS workers noticed a double twist lock condition on container FDPU200955-9 during the course of unlashing the cargo containers.  Mr. Corbitt and Mr. Black, each of whom had more than thirty years of experience as longshoremen, testified they had never before seen a double twist lock on a cargo container.  Villaber also noticed the double twist lock condition; whether he reported it to anyone is contested.  The longshoremen did not report the double twist lock to their supervisors or to the crane operator.

During the discharge of cargo, the crane operator, Charles Stewart ("Stewart"), attempted to lift container FDPU200955-9 with the ship's on board aft crane.  The aft end of the container, with the double twist lock condition, lifted; but the container did not lift completely because the front twist lock was locked.  Stewart set the container back down and yelled for

someone to fix the problem immediately.  Seals climbed onto a staging platform, approximately three feet wide and fifteen and a half feet long, to release the twist lock at the forward end of the container manually.  After Seals released the twist lock, the container was lifted.  It drifted forward and crushed Seals' head against a stationary container at the other end of the staging platform.  Seals was killed.  Following Seals' death, someone removed the bottom half of the double twist lock at the aft end of the container.

Wheelings filed her first complaint against Seatrade alone on April 14, 2006.  Seatrade filed a motion to dismiss for lack of personal jurisdiction and improper venue, but upon further investigation, it conceded the court had jurisdiction and the motion was denied as moot.  After a hearing at which defense counsel stated Seatrade was not the owner of the vessel M/V Lombok Strait, Wheelings filed a first amended complaint naming the owner of the vessel, Shipping Company, as an additional defendant.  The court then granted Wheelings' motion for leave file a second amended complaint adding the vessel M/V Lombok Strait as defendant.

Defendants filed a third party complaint against Comercializadora Anfo, S.A. ("Anfo"), the stevedore and terminal operating business that allegedly loaded the container that killed Seals.  (Am. Third-Party Compl. ¶ 8.)  The court severed defendants' claims against Anfo.

Before the court are Wheelings' motion to amend or correct the second amended complaint, defendant Shipping Company's motion to dismiss for lack of personal jurisdiction, Wheelings' motion for partial summary judgment as to agency, defendants' cross-motion for summary judgment on agency, defendants' motion for summary judgment, defendants' motion in limine to preclude certain testimony by plaintiff's liability expert, Captain Joseph Ahlstrom, defendants' motion in limine to preclude testimony by plaintiff's medical/psychological expert, Dr. Harry A. Doyle, plaintiff's motion in limine to preclude testimony of Kenneth Allen, and

plaintiff's motion for sanctions regarding spoliation of evidence.

## II.       MOTION TO AMEND/CORRECT COMPLAINT

Wheelings filed a motion to amend or correct her second amended complaint to add a demand for punitive damages as to all defendants.  Under Fed.R.Civ.P. 15(a), a party may amend its pleading by leave of court, and "leave shall be freely given when the justice so requires."  In Foman v. Davis, 371 U.S. 178, 182 (1962), the Court stated:

> "If the underlying facts or circumstances relied upon by a plaintiff may be a
> proper subject of relief, he ought to be afforded an opportunity to test his claim on
> the merits.  In the absence of any apparent or declared reason – such as undue
> delay, bad faith or dilatory motive on the part of the movant, repeated failure to
> cure deficiencies by amendments previously allowed, undue prejudice to the
> opposing party by virtue of allowance of the amendment, futility of amendment,
> etc. – the leave sought should, as the rules require, be 'freely given.'"

"Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997). In determining "futility," the district court applies the same standard of legal sufficiency as applies under Fed. R. Civ. P. 12(b)(6).  Id.  Therefore, before allowing Wheelings to amend her complaint to add punitive damages, the court must find that punitive damages are available for her claims.

### A.       Punitive damages under the LHWCA

Wheelings seeks to amend her complaint to claim punitive damages under the LHWCA.  Unlike the Death on the High Seas Act, which creates a wrongful death cause of action for representatives of individuals killed on the high seas,[4] the LHWCA does not expressly

---

[4]  The Death on the High Seas Act provides "fair compensation for the pecuniary loss sustained by the individuals for whose benefit the action is brought."  46 U.S.C.A. § 30303. Non-pecuniary damages, not recoverable under the Death on the High Seas Act, means "damages

or implicitly limit available recovery.  The court looks to general maritime law to inform its decision whether punitive damages are available under the LHWCA.  Rutherford v. Mallard Bay Drilling, L.L.C., 2000 WL 805230 *2 (E.D. La. 2000) (any right to punitive damages under the LHWCA arises from general maritime law, unlimited by statutory constraint).  If Congress meant to limit the damages available under the LHWCA, it would have done so expressly, as it did with respect to the Death on the High Seas Act.  Since the LHWCA is silent on the availability of punitive damages, the court follows general maritime law under United States v. Gaudet, 414 U.S. 573 (1974).

In Gaudet, the United States Supreme Court held that general maritime law allows recovery of nonpecuniary damages for the death of a longshoreman.  414 U.S. at 573 (decedent's widow may recover damages for loss of society under the maritime wrongful death cause of action), rev'd, 498 U.S. 19 (1990).  The Gaudet decision has since been narrowed to its facts.  In Miles v. Apex Marine Corp., the United States Supreme Court stated that the holding of Gaudet applies only in territorial waters, and only to longshoremen.  498 U.S. 19, 31 (1990).  Notwithstanding that it has narrowed the Gaudet decision to its facts, the United States Supreme Court has not overruled it directly.  See Calhoun v. Yamaha Motor Corp, U.S.A., 40 F.3d 622, 634 (3d Cir. 1994), aff'd, 516 U.S. 199 (1996).  The Gaudet analysis remains applicable to this action: like the decedent in Gaudet, Seals was a longshoreman killed in territorial waters.  Nonpecuniary damages, including punitive damages, are available under the LHWCA in appropriate cases.  Rutherford, 2000 WL 805230 *4.  The court will allow Wheelings to amend the complaint to claim punitive damages under the LHWCA.  Whether punitive damages may be

---

for loss of care, comfort, and companionship."  46 U.S.C.A. § 30307.

awarded on the facts of this case depends on the evidence at trial.

**B.      Punitive damages under state law**

The remedy provided under the LHWCA for negligence of a vessel is exclusive of all other remedies against the vessel.  33 U.S.C. § 905(b) ("[t]he remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter"); <u>cf.</u> <u>Helaire v. Mobil Oil Co.</u>, 709 F.2d 1031, 1042 (5th Cir. 1983) (state law negligence claim properly dismissed under exclusivity provisions of LHWCA).  State law may supplement maritime law when maritime law is silent or where a local matter is at issue, but state law may not be applied where it would conflict with federal maritime law.  <u>Calhoun</u>, 40 F.3d at 636.  Wheelings' claims for state law remedies conflict with the LHWCA's exclusivity provision.  It would be futile for Wheelings to amend her complaint to claim punitive damages under state law.

Wheelings' motion to amend her complaint to seek punitive damages will be granted as to her LHWCA claims and denied as to her state law claims.

**III.     B.V. SHIPPING COMPANY LOMBOK STRAIT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

Defendant Shipping Company filed a motion to dismiss for lack of personal jurisdiction.  A federal court may exercise personal jurisdiction to the extent authorized by the state's long-arm statute.  <u>See</u> Fed. R. Civ. P. 4(e).  Pennsylvania's long-arm statute extends jurisdiction to the fullest extent allowable under the United States Constitution.  42 Pa. Cons. Stat. Ann. § 5322(b).

Under the Fourteenth Amendment Due Process Clause, personal jurisdiction may be asserted over a nonresident so long as the defendant has certain "minimum contacts" with the

forum such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). A court has specific jurisdiction if the defendant has "purposefully directed" its activities at the forum and the injury arises from, or is related to, those activities. Telcordia Tech Inc. v. Telkom SA Ltd., 458 F.3d 172, 177 (3d Cir. 2006). Where the cause of action does not arise out of the defendant's forum-related activities, a court may assert general jurisdiction if the defendant has "continuous and systematic" contacts with the forum state. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984).

Defendants argue the court does not have specific jurisdiction over Shipping Company because Seals' accident occurred aboard the vessel M/V Lombok Strait while it was moored in Camden, New Jersey. (Mem. in Supp. of Def.'s Mot. to Dismiss 5.) Wheelings argues there is specific jurisdiction over Shipping Company because Seals, a Pennsylvania resident, was hired out of a Philadelphia union hall to discharge cargo from the M/V Lombok Strait. (Mem. in Opp. to Def.'s Mot. to Dismiss 14.) Seals' accident aboard the M/V Lombok Strait in Camden, New Jersey, not the circumstances of Seals' hire in Pennsylvania, gives rise to the claims in suit. However, the crew's allegedly negligent inspection of and failure to report the double twist lock condition do give rise to Wheelings' claims for violation of the LHWCA and may have occurred in Pennsylvania waters. This possibility has not yet been factually developed on the record..

As to general jurisdiction over Shipping Company, Wheelings alleges Shipping Company's only asset, the vessel M/V Lombok Strait, transported cargo through Pennsylvania waters at least fifty-five times between July 2003 and November 2006, and berthed in Philadelphia at least three times. (Mem. in Opp. to Def.'s Mot. to Dismiss 15-16.) This alone

9

may not be sufficient to establish general personal jurisdiction over Shipping Company.  Cf.

Carney v. Bill Head Trucking, Inc., 83 F.Supp.2d 554, 557 (E.D. Pa. 2000) (no general

jurisdiction in Pennsylvania over defendant whose trucks passed through Pennsylvania highways

"from time to time" for business).  However, at the hearing on March 27, 2007, Wheelings

alleged Shipping Company hired General Steamship Corporation as its agent in Pennsylvania.

Shipping Company averred it did not hire General Steamship Corporation.  Whether Shipping

Company employed an agent authorized to receive service of process in Pennsylvania is a

disputed issue of fact.  The court will hold an evidentiary hearing on Shipping Company's

motion to dismiss for lack of personal jurisdiction on June 7, 2007.

## IV.     PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON AGENCY

Wheelings filed a motion for partial summary judgment to establish the agency

relationship between Seatrade and the crew of the vessel M/V Lombok Strait.  A motion for

summary judgment will be granted only if there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party moving

for summary judgment has the ultimate burden of showing the absence of a genuine issue as to

any material fact.  Gans v. Mundy, 762 F.2d 338, 343 (3d Cir. 1985).  All inferences must be

drawn in favor of the nonmoving party.  Id. at 340.  The nonmoving party's assertions must be

taken as true and, if these assertions conflict with those of the moving party, the nonmoving party

must receive the benefit of the doubt.  Id.

Defendants aver Shipping Company was the owner of the M/V Lombok Strait

(Shipping Co.'s Mot. to Dismiss ¶ 4.), and Seatrade was the agent of Shipping Company (Def.'s

Answer to Pl's Mot. Partial Summ. J. ¶ 9.).  An agent for the ship owner – such as Seatrade –

may be liable for its own negligence as a "vessel" under the LHWCA, 33 U.S.C. § 905(b).  See

33 U.S.C. § 902(21) ("vessel" defined as: "any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member").  The pertinent issue in this motion is whether Seatrade had an agency relationship with the vessel's crew and was responsible for the crew's alleged violations.

In support of her motion for partial summary judgment on agency, Wheelings argues a contract between Seatrade and Cobalt provided Seatrade would hire crew from Cobalt, and the crew would be agents of Seatrade.  (Mot. for Partial Summ. J. 14.)  However, an examination of the contract itself reveals that the signatories were Shipping Company and Cobalt – not Seatrade.  (Defs.' Mem. in Opp. to Pl.'s Mot. for Partial Summ. J., Ex. A, App. 6.) Therefore, the Cobalt contract does not establish an agency relationship between Seatrade and the crew of the M/V Lombok Strait.

The relationship among Shipping Company, Seatrade, and the crew of the M/V Lombok Strait is governed by the September 30, 2002, contract between Shipping Company and Seatrade.  Part I, box 18, of the contract provides the contract is to be interpreted under Dutch law (Defs.' Mem. in Opp. to Pl.'s Mot. for Partial Summ. J., Ex. A, App. 5), and the parties do not dispute that Dutch law governs.  The September 30, 2002, contract between Shipping Company and Seatrade states in relevant part:

"3.1 Crew Management . . .
The Managers shall provide suitably qualified Crew for the Vessel as required by the Owners in accordance with the STCW 95 requirements, provision of which includes but is not limited to the following functions: . . . (vi) training of the Crew and supervising their efficiency.

4.1 The Managers undertake to use their best endeavours to provide the agreed Management Services as agents for and on behalf of the Owners in accordance with sound ship management practice and to protect and promote the interests of the Owners in all matters relating to the provision of services hereunder . . .

11.  Responsibilities . . .

(ii) Notwithstanding anything that may appear to the contrary in this Agreement, the Managers shall not be liable for any of the actions of the Crew, even if such actions are negligent, grossly negligent or wilful, except only to the extent that they are shown to have resulted from a failure by the Managers to discharge their obligations under sub-clause 3.1, in which case their liability shall be limited in accordance with the terms of Clause 11."

(Defs.' Mem. in Opp. to Pl.'s Mot. for Partial Summ. J., Ex. A, App. 5.)

Shipping Company has submitted an affidavit, interpreting the contract under Dutch law, from H. van der Wiel, an attorney admitted to the Rotterdam Bar.  The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  Fed. R. Civ. P. 44.1.  Though Rule 44.1 permits a court to consider any relevant material or source, expert testimony is the most common method of determining foreign law.  Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc., 181 F.3d 446, 459 (3d Cir. 1999).  The affidavit of H. van der Wiel states:

"7.    [The contract] shows that [Seatrade] is the manager of the "Lombok Strait".  As to the crew management, clause 3.1 applies.  It provides that [Seatrade] as manager shall provide suitably qualified crew for the vessel as required by the shipowner.  This means that, as usual in shipping between a manager and a shipowner, [Seatrade] exercises its activities for and on behalf of the shipowner.  This is also specified in clause 4.1, reading as far as material here: *The Managers undertake to use their best endeavours to provide the agreed Management Services as agents for and on behalf of the Owners in accordance with sound ship management practice and to protect and promote the interests of the Owners in all matters relating to the provision of services hereunder . . .*

"Clause 11.2(ii) provides that the Manager shall not be liable for any actions of

12

the Crew, even if such actions are negligent, grossly negligent or wilful, except only to the extent that they are shown to have resulted from a failure by the Managers to discharge their obligations under the Shipman Agreement, in which case their liability shall be limited in accordance with the terms of clause 11.  I think that this clause 11.2(ii) is clear and provides that [Shipping Company] is almost always responsible between it and the manager [Seatrade] for liability for faults of the crew.

"29.    The next point is: who employs the crew?

"30.    [The contract] provides that [Seatrade] hires the crew on behalf of [Shipping Company], so that [Shipping Company] is the employer of the crew . . .

"32.    I will now discuss article 7:658 sub 4 Dutch Civil Code, which reads (in my English translation) as far as material here: *He who has labour performed in the exercise of his profession or company by a person with whom he has no labour agreement, is liable in conformity with the paragraphs 1 up to and including 3 for the damage which this person sustains when doing his work.*

"The paragraphs 1 and 3 of article 658 provide, shortly put, that the employer is obliged to create safe working conditions to prevent accidents, failing which the employer is liable.

"33.    In Dutch law paragraph 4 of article 658 has given rise to the distinction between the formal employer (with whom the employee has formally a labour contract) and the material employer (with whom the employee has no labour contract, but in whose profession or company the work is done).

"In the 'Lombok Strait' case the consequence hereof is that, if the shipowner [Shipping Company] is not the formal employer of the crew, it is anyhow the material employer of the crew and therefore liable vis-à-vis the crew as if it were the formal employer of the crew.  This means that [Shipping Company] is the material employer in the mentioned sense of those words, also vis-à-vis the crew members who have a labour contract with another company, like SeaServices Groningen B.V. or Scanmar Maritime Services, Inc. or Crown Shipmanagement, inc. [sic]  But the crew does the work for the benefit of the enterprise of the shipowning company [Shipping Company] and not for the benefit of its manager [Seatrade] in Dutch law.  Consequently [Seatrade] is not the material employer of the crew (and not the formal employer of the crew either).

"34.    Accordingly, under Dutch law, [Shipping Company] is the entity liable vis-à-vis third parties for any negligence or fault of the crew."

(H. van der Wiel Aff. ¶¶ 7-34)

        H. van der Wiel interpreted the September 30, 2002, contract to mean that

Seatrade hires the crew on behalf of Shipping Company, and Shipping Company is the employer of the crew.  H. van der Wiel also attested that under the contract, the crew did not work for the benefit of Seatrade.  H. van der Wiel's affidavit constitutes material evidence that there was no agency relationship between Seatrade and the crew of the M/V Lombok Strait.  Wheelings' motion for partial summary judgment as to agency will be denied.

## V.    DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT ON AGENCY

Defendants filed a cross-motion for summary judgment that Seatrade is not responsible for the actions of the vessel M/V Lombok Strait's crew, and therefore should be dismissed from the action.  The relevant issue is whether Seatrade, as an agent of Shipping Company, may be liable under the LHWCA for its alleged failure to train and supervise the crew of the M/V Lombok Strait.

Defendants point to H. van der Wiel's affidavit in support of their argument that Shipping Company maintained responsibility for the conduct of the vessel's crew at all times. (Defs.' Answer to Pl.'s Mot. for Partial Summ. J. on Agency ¶ 4.)  Paragraph 34 of H. van der Wiel's affidavit states that under Dutch law, Shipping Company is the entity liable vis-à-vis third parties for any negligence or fault of the crew.  (H. van der Wiel Aff. ¶ 34 [emphasis added].) But in paragraph 7, H. van der Wiel concedes Seatrade is sometimes liable for the negligence of the crew: it states that between Shipping Company and Seatrade, Shipping Company is "almost always" liable for the faults of the crew (H. van der Wiel Aff. ¶ 7).  Under the September 30, 2002, contract, paragraph 3.1, Seatrade undertook the responsibility of training the crew members and supervising their efficiency.  Under paragraph 11 of the contract, Seatrade is liable for the actions of the crew members to the extent that Seatrade failed to train and supervise them.

Paragraph 34 of H. van der Wiel's affidavit is not credible to the extent that it contradicts

paragraph 7 of the same affidavit, and ignores the plain terms of the September 30, 2002,

contract between Seatrade and Shipping Company.  Under the plain language of the September

30, 2002, contract, and under paragraph 7 of H. van der Wiel's affidavit, Seatrade is sometimes

liable for the negligence of the crew, if Seatrade fails its duty to train or supervise the crew.

Whether Seatrade's failure to train and supervise the crew caused injury to Seals is a jury

question.

Defendants argue that an agent such as Seatrade may not be held liable for the

duties and responsibilities that the principal, Shipping Company, owes to third parties such as

Seals, even if these duties and responsibilities fall within the purview of the agent's duties.

(Defs.' Mem. in Opp. to Pl.'s Mot. for Partial Summ. J. on Agency 6.)  Wheelings does not

contest Shipping Company's liability for the actions of the crew, but argues Seatrade is also

liable.  It is well-established under American tort law that an agent is liable for its own

negligence; and the rights of a principal and agent relative to each other are not the measure of

the rights of third persons against either of them for tortious conduct.  Brady v. Roosevelt S.S.

Co., 317 U.S. 575, 580, 583 (1943).  The LHWCA provides a cause of action against agents of a

vessel for negligence, 33 U.S.C. § 905(b); the September 30, 2002, contract between Shipping

Company and Seatrade does not preclude this cause of action.  Defendants' argument that

Seatrade may not be held liable for performance of its contractual duties does not take into

account Wheelings' claim for negligence against agents of the vessel under the LHWCA.

Finally, defendants argue Seatrade never agreed to assume the duties and

responsibilities of a de facto owner of the M/V Lombok Strait.  (Defs.' Mem. in Opp. to Pl.'s

Mot. for Partial Summ. J. on Agency 5.)  Defendants cite Mullen v. Hoyu Kaiun Kabushiki

15

Kaisha, 1990 AMC 1751 (E.D. Pa. 1990), and Irby v. Tokai Lines, 1990 U.S. Dist. LEXIS 2116

(E.D. Pa. 1990), in favor of their argument that Seatrade bears no responsibility as a de facto

owner for the actions of the vessel M/V Lombok Strait's crew.  Mullen and Irby state that under

admiralty law, absent an agreement to the contrary, a time charterer has no control over the vessel

and assumes no liability for negligence of the crew or unseaworthiness of the vessel.  Mullen,

1990 AMC 1751 *11; Irby, 1990 U.S. Dist. LEXIS 2116 *18-19.  These cases are inapposite,

since defendants conceded Seatrade was an agent of Shipping Company and not a time charterer.

(Defs.' Mem. in Opp. to Pl.'s Mot. for Partial Summ. J. 7-8.)

Defendants' cross-motion for summary judgment that Seatrade is not responsible

for the actions of the vessel's crew will be denied.

## VI.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Under the LHWCA, a longshoreman may sue the vessel on which he was injured

for negligence.  33 U.S.C. § 905(b).  Where the vessel's negligence causes injury to a

longshoreman, the vessel is liable for the full amount of the longshoreman's damages, less the

percentage of damages caused by the longshoreman's own negligence.  Hill v. Reederei F. Laeisz

G.M.B.H., Rostock, 435 F.3d 404, 413 (3d Cir. 2006).  "Vessel" is defined as "any vessel upon

which or in connection with which any person entitled to benefits under this chapter suffers

injury or death arising out of or in the course of his employment, and said vessel's owner, owner

pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member."  33

U.S.C. § 902(21).

The LHWCA imposes three duties on vessels: (1) the "turnover duty"; (2) the

"active operations" duty; and (3) the "intervention" duty.  Serbin v. Bora Corp., Ltd., 96 F.3d 66,

70 (3d Cir. 1996).  Wheelings has alleged breach of the turnover duty and duty to intervene; defendants filed a motion for summary judgment that they did not violate these duties.

### A.    Turnover Duty

A vessel has the "turnover duty" to: exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced [longshoreman] will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety"; and warn the longshoreman of "any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the [longshoreman] in the course of his cargo operations and that are not known by the [longshoreman] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work."  Scindia, 451 U.S. at 167.

Ordinarily, if a longshore worker was injured by an obvious hazard, then the vessel will not be liable for breach of the turnover duty.  Kirsch v. Plovidba, 971 F.2d 1026, 1029 (3d Cir. 1992).  But if a vessel should have expected that an expert longshoreman could not or would not avoid the hazard and conduct cargo operations with reasonable safety, it may be found negligent for failing to eliminate the hazard.  Id. at 1031.  The vessel will be liable if: (1) the vessel should have known the longshoreman would confront the hazard; or (2) avoiding the hazard would be impractical for the longshoreman – for example, where the longshoreman's only alternatives are to leave the job or face trouble for delaying the work.  Hill, 435 F.3d at 409, 410.

Defendants argue the vessel did not have constructive knowledge of the double twist locks because only Villaber, an unlicensed crew member and not an officer, knew of the

17

condition.  Certain crew members may hold positions such that their knowledge should be attributed to the vessel.  Cf. Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 105-06 (3d Cir. 1994) (remand to district court where there was "sufficient evidence on the record to support a permissible inference that, during the loading process, some crew members, who might have held positions such that their knowledge should be attributed to the vessel, did in fact observe" the dangerous condition).  If the crew members had a duty to inform the vessel of the dangerous condition, then their knowledge of that condition may be imputed to the vessel.  Cf. Canizzo v. Farrell Lines, Inc., 579 F.2d 682, 690 (2d Cir. 1978) (Friendly, J., dissenting).  Wheelings has produced evidence that the Chief Officer of the M/V Lombok Strait, Nicholas Zegers, would have expected Villaber to inform him of the double twist lock condition (Zegers Trial Dep. 43:22-23, Feb. 7, 2007.), and Villaber would have been reprimanded for failing to notify a supervisor about an unusual occurrence with the ship's equipment.  (Zegers Trial Dep. 47:24-48:1, Feb. 7, 2007.)  There is an issue of material fact whether Villaber had the duty to report the defective condition to the vessel's officers.

Defendants also argue that the double twist lock condition was an open and obvious hazard.  In Jackson v. Egyptian Navigation Co., 364 F.3d 113, 114-15 (3d Cir. 2004), a longshoreman was injured on a vessel when he walked across a weak, narrow board extending across an open space, and the board broke under him.  The court found no breach of the turnover duty because it was obvious to a competent longshoreman that the narrow and unprotected board constituted a hazard.  Id. at 117.  This action is distinguishable.  While the double twist lock condition was apparent to Seals, Wheelings has produced testimony that several longshoremen had never before seen a double twist lock condition, and it was not obvious to a competent longshoreman that the condition presented a hazard.  Defendants' motion for summary judgment

18

will be denied with respect Wheelings' claim for breach of the turnover duty because there are genuine issues of material fact whether Villaber had the duty to report the defective condition to the vessel's officers and whether the double twist lock condition presented an obvious hazard.

### B.    Duty to Intervene

The LHWCA imposes upon a vessel the "duty to intervene" once cargo operations have begun, where the ship's crew knows or is charged with knowing that the longshoreman is proceeding in an "obviously improvident" manner.  See Scindia, 451 U.S. at 175-76; Kirsch, 971 F.2d at 1029.  The duty to intervene is limited.  Absent contract provision, positive law, or custom to the contrary, the vessel has no general duty to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the longshoreman.  Scindia, 451 U.S. at 172.  Thus, the vessel is not liable to the longshoreman for failing to prevent or warn of dangers, unless it knew of or had a duty to inform itself of the dangers.  Id.  Wheelings avers that a crew member, Villaber, knew of the double twist locks. There is an issue of material fact whether Villaber knew the double twist locks constituted a dangerous condition; Wheelings produced evidence that Villaber hid while the defective container was being lifted because he was "scared."  (Pl.'s Response to Mot. Summ. J. ¶ 15.) There is also an issue of material fact whether Villaber had a duty to inform his superiors about the double twist lock condition.  Wheelings has produced evidence that the Chief Officer of the M/V Lombok Strait, Nicholas Zegers, would have expected Villaber to inform him of the double twist lock condition (Zegers Tr. Dep. 43 ll. 22-23.), and Villaber would have been reprimanded for failing to notify a supervisor about an unusual occurrence with the ship's equipment.  (Zegers Tr. Dep. 47-48.)  Defendants' motion for summary judgment will be denied.

**VII.   DEFENDANTS' MOTION IN LIMINE TO PRECLUDE CERTAIN TESTIMONY BY CAPTAIN JOSEPH AHLSTROM**

Defendants have filed a motion in limine to preclude Wheelings' expert, Captain Joseph Ahlstrom ("Ahlstrom"), from testifying as to areas outside his expertise.  Defendants argue Ahlstrom should not testify about stevedoring activities since his area of expertise is sailing.  Defendants also argue Ahlstrom's expert report improperly states a legal opinion and makes a credibility determination.  In his expert report, Ahlstrom stated: "Although [Villaber] testified that he does not recall who removed [the twist locks], the testimony reveals that he was the only person in the area during the brief period of time between the incident and the arrival of the Chief Mate."  (Defs.' Mem. of Law, Mot. In Limine to Preclude Certain Testimony by Pl.'s Liability Expert, Captain Joseph Ahlstrom 4-5.)  Wheelings argues Ahlstrom is competent to testify as to the duties owed by a captain and crew to longshoremen, and Ahlstrom did not offer a legal opinion or a credibility determination.

Ahlstrom may only testify as to matters within his expertise.  He cannot give legal opinions.  He may testify as to the duties of the crew from his experience as a captain.  Ahlstrom may also base his expert opinion on his own determination that Villaber lied or hid the twist locks, so long as he states the basis for his opinion to the jury.  Before trial, the court will review Ahlstrom's expert report with the parties and specify the boundaries of Ahlstrom's testimony.  Defendants' motion in limine to preclude certain testimony by Captain Joseph Ahlstrom will be granted in part and denied in part.

**VIII.   DEFENDANTS' MOTION IN LIMINE TO PRECLUDE TESTIMONY BY DR. HARRY A. DOYLE**

Defendants filed a motion in limine to preclude testimony by Wheelings' expert,

Dr. Harry A. Doyle.  Dr. Doyle's expert report states:

> "It is well documented in the psychiatric literature and in clinical practice that,
> when an individual experiences an event that involves actual or threatened death
> or serious bodily injury, that person also experiences intense emotions, including
> acute fear, helplessness and/or horror.  Photographic evidence documents that
> James Seals was struck in the head by a moving container approximately 6 feet
> from the end of the catwalk where he had been working, that he was facing the
> container as it struck him and that there was no means of escape or rescue
> available to him.  Autopsy results document that Mr. Seals sustained direct trauma
> to his head in a front to back impact injury.  Therefore, based upon photographic
> evidence and autopsy results, it is my opinion, within a reasonable degree of
> medical certainty, that Mr. Seals experienced intense feelings of fear, helplessness
> and horror at the time of the accident because he was aware that he was about to
> be seriously injured or killed by a large steel container and because he attempted
> to save his life by fleeing and/or ducking from the moving container before his
> skull was crushed.
>
> "Although no one witnessed the actual crush injury, testimony by Charles Stewart,
> the crane operator, documents that, as he attempted to lift the container with the
> crane, he saw James Seals after the crush injury 'out of the corner of my eye,' that
> Mr. Stewart 'yelled and screamed and hollered like a mad man to try to get him
> some sort of help' and that 'it took a couple minutes before Mr. Black appeared'
> at the scene of the fatal injury.  Testimony by Richard Black documents that he
> climbed 'up there on the next tier' in an attempt to assist Mr. Seals, that, 'when I
> got there he [Jimmy] was taking his last three breaths' and 'I see him, he takes his
> last breath and I start crying,' indicating that James Seals was alive for a brief
> period after he was struck in the head by the container.  Therefore, based upon the
> above testimony, it is my opinion, within a reasonable degree of medical certainty,
> that, because James Seals did not die instantaneously as a result of the crush injury
> to his head, he experienced a period of conscious pain and suffering from the time
> the container initially impacted his skull until his death several minutes later."
>
> (Mot. *in Limine* to Preclude Testimony of Dr. Doyle, Ex. 1.)

Wheelings argues Dr. Doyle's testimony would explain a person's reactions to the imminent

threat of physical harm, that Seals was aware of his impending death, and was still breathing after

his head was crushed.  Defendants argue Dr. Doyle's testimony regarding Seals' psychological

trauma is not based on sufficient facts, data, principles or methods, but on hypothesis and

conjecture from photographs and the autopsy reports.  Defendants also claim Seals died upon

impact.

If the jury believes Seals' death was anticipated and/or not instantaneous, then it is not necessary for an expert to testify as to the fear or horror Seals may have felt. The jury is capable of deciding whether the photographs and witness and expert testimony prove Seals experienced fear or horror. Defendants' motion in limine to preclude testimony by Dr. Harry A. Doyle will be granted.

## IX.   PLAINTIFF'S MOTION IN LIMINE TO PRECLUDE TESTIMONY OF KENNETH ALLEN

Wheelings has filed a motion in limine to preclude the testimony of defense expert Kenneth Allen. The parties have requested a Daubert hearing, so the court will defer decision on the motion until after the hearing, now scheduled for June 7, 2007, at 2:00 p.m.

## X.   PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

Wheelings filed a motion for sanctions under Fed. R. Civ. P. 37(c) and avers defendants: never supplied to investigators the twistlocks that Villaber discarded; prohibited on-scene investigators from speaking to eyewitnesses; and failed to preserve as evidence the container that killed Seals. (Mem. in Supp. Pl.'s Mot. for Sanctions 10.) Wheelings requests an order precluding the expert testimony of Kenneth Allen, precluding certain reports regarding Seals' death, and permitting an adverse inference with respect to the missing evidence. Defendants argue that Wheelings never requested production of the container, and the container did not belong to defendants but to Del Monte, the charterer of the M/V Lombok Strait. (Defs.' Response to Pl.'s Mot. for Sanctions 1.) Defendants also aver the container is presently in Moin, Costa Rica. Id. at 2. At the hearing on March 27, 2007, defendants argued that none of the

22

officers of the M/V Lombok Strait had knowledge of the double twist locks, and Villaber did not recall moving them.  In the absence of evidence of a deliberate attempt to conceal evidence, the court will not impose the requested sanctions.  Wheelings' motion for sanctions will be denied.  Defendants' request for costs will also be denied.

## XI.    CONCLUSION

Wheelings' motion for leave to amend the second amended complaint will be granted in part and denied in part.  Wheelings may add a request for punitive damages under the LHWCA claim, but may not add a request for punitive damages under the state law claims.  Wheelings' motion for partial summary judgment as to agency, and defendants' cross-motion for summary judgment on agency, will be denied.  Defendants' motion for summary judgment will be denied.  Defendants' motion in limine to preclude certain testimony by Wheelings' liability expert, Captain Joseph Ahlstrom, will be granted in part and denied in part: Ahlstrom may not give legal opinions, but he may testify as to the duties of the crew from his experience as a captain, and he may base his expert opinion on his own credibility determinations so long as he states the bases of his opinion for the jury.  Defendants' motion in limine to preclude testimony by Dr. Harry A. Doyle will be granted.  Wheelings' motion for sanctions for spoliation of evidence will be denied.

An evidentiary hearing on defendants' motion to dismiss for lack of personal jurisdiction will be held on June 7, 2007.  A Daubert hearing regarding Wheelings' motion in limine to preclude testimony of Kenneth Allen will follow the hearing on the motion to dismiss.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DEBORAH WHEELINGS, Administratrix** | : | **CIVIL ACTION** |
| **of the Estate of Lewis James Seals** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SEATRADE GRONINGEN, BV,** | : | |
| **SHIPPING COMPANY LOMBOK** | : | |
| **STRAIT, BV, and M/V LOMBOK STRAIT,** | : | |
| **her engines, tackle, equipment, furnishings,** | : | |
| **etc., in rem** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **COMERCIALIZADORA ANFO, S.A.,** | : | |
| **also known as ANFO** | : | **NO.  06-1585** |

<u>**ORDER**</u>

      **AND NOW**, this 31st day of May, 2007, following a hearing on March 27, 2007, where counsel for all parties were heard, upon consideration of motion to amend/correct plaintiff's second amended complaint (paper no. 41), defendant Shipping Company Lombok Strait, BV's motion to dismiss for lack of personal jurisdiction (paper no. 49), plaintiff's motion for partial summary judgment as to agency (paper no. 42), defendants' cross-motion for summary judgment on agency (paper no. 55), defendants' motion for summary judgment (paper no. 53), defendants' motion <u>in limine</u> to preclude certain testimony by plaintiff's liability expert, Captain Joseph Ahlstrom (paper no. 51), defendants' motion <u>in limine</u> to preclude testimony by plaintiff's medical/psychological expert, Dr. Harry A. Doyle (paper no. 54), plaintiff's motion <u>in limine</u> to preclude testimony of Kenneth Allen (paper no. 58), plaintiff's motion for sanctions regarding spoliation of evidence (paper no. 59), and all responses, for the reasons stated in the accompanying memorandum, it is **ORDERED** that:

      1.     Wheelings' motion for leave to amend/correct the second amended complaint (paper no. 41) is **GRANTED in part** and **DENIED in part**.

      2.     An evidentiary hearing regarding defendant Shipping Company Lombok Strait, BV's motion to dismiss for lack of personal jurisdiction (paper no. 49) is scheduled for **June 7, 2007** at **2:00 p.m.**.

      3.     Wheelings' motion for partial summary judgment as to agency (paper no. 42) is **DENIED.**

      4.     Defendants' cross-motion for summary judgment on agency (paper no. 55) is

**DENIED**.

      5.     Defendants' motion for summary judgment (paper no. 53) is **DENIED**.

      6.     Defendants' motion in limine to preclude certain testimony by plaintiff's liability expert, Captain Joseph Ahlstrom (paper no. 51) is **GRANTED in part** and **DENIED in part**.

      7.     Defendants' motion in limine to preclude testimony by plaintiff's medical/ psychological expert, Dr. Harry A. Doyle (paper no. 54) is **GRANTED**.

      8.     A Daubert hearing regarding Wheelings' motion in limine to preclude testimony of Kenneth Allen (paper no. 58) will take place after the evidentiary hearing on defendants' motion to dismiss on **June 7, 2007** at **2:00 p.m.**.

      9.     Wheelings' motion for sanctions regarding spoliation of evidence (paper no. 59) is **DENIED**.

 

/s/ Norma L. Shapiro

Norma L. Shapiro, S.J.